## WILLACY COUNTY WATER CONTROL AND IMP. DIST. NO. ONE v. TODD.

No. 12477.

Court of Civil Appeals of Texas.
San Antonio.

Dec. 31, 1952.

Rehearing Denied Jan. 28, 1953.

Sawnie B. Smith, Edinburg, S. L. Gill, Raymondville, for appellant.

Kelley, Looney, McLean & Littleton, Edinburg, R. F. Robinson, Raymondville, Sidney Farr, Edinburg, for appellee.

W. O. MURRAY, Chief Justice.

This suit was instituted by Chess E. Todd in the District Court of Willacy County, Texas, against Willacy County Water Control and Improvement District Number One, seeking to recover damages, both actual and punitive, in the total sum of $54,-000, allegedly occasioned by defendant in digging a drainage ditch across the entire north side of plaintiff's property, namely, across Lots 1, 2, 3, 4 and 5 of Block 1, Narcisso Tract No. 4, in Willacy County, Texas. Defendant answered setting up, among other things, that plaintiff had made a parol gift to it of the land across which it had dug the drainage ditch and, in the alternative, asking that if it be mistaken in this, then, that it be permitted to exercise its power of eminent domain and take an easement across plaintiff's land at the place where it had constructed its drainage ditch.

The trial was to a jury and resulted in judgment (1) in favor of defendant against plaintiff for a perpetual easement for the purpose of constructing, maintaining and operating a drainage ditch, as a part of its drainage system, over a parcel of land consisting of 9.95 acres, across the north side of Lots 1, 2, 3, 4 and 5, in Block No. 1, of Narcisso Tract No. 4, out of the San Juan de Carricitas Grant in Willacy County, Texas, and fully described by metes and bounds in said judgment, and (2) in favor of plaintiff against defendant in the sum of $4,119.30, together with interest, from which judgment Willacy County Water Control and Improvement District Number One has prosecuted this appeal.

The determining question in this appeal is, whether the evidence was sufficient to raise a fact issue as to a parol gift of the 9.95 acres of land herein involved by appellee to appellant.

A full statement of the evidence is here desirable.

Some time, about August, in 1948 appellant decided that it was desirable to dig a drainage ditch across the property belonging to appellee. First it contemplated this ditch would be dug across the center of appellee's property, running in an east-west direction. E. P. Congdon, appellant's general manager, began negotiations with appellee by letter, seeking an easement across his land for this drainage ditch. Several letters passed back and forth between the parties concerned. It developed that appellee desired that the drainage ditch go across the north end of his land and be one-half on his land and one-half on the Yturria land, which lay just to the north. Appellee also wanted drainage "inlets" so that his land might drain into the ditch.

Appellant's contention that appellee made a parol gift of the right-of-way for the drainage ditch across his land is largely based upon the following testimony given by E. P. Congdon, to-wit:

"A. I think the last time I talked to him on the place must have been in November or early December.

"Q. You talked to him on the place. Did you talk to him on the place more than one time during that interval? A. Yes.

"Q. What was your conversation; what did you do out there? A. We went out to look at the condition of the land, the condition of the canals and borrow pits. There were several things about which Mr. Todd was complaining. One of them was that there were dome pipe lines on the place that didn't deliver sufficient heads of water, sufficient quantities of water. Another was, as I recall, there was a lagoon in the southwest corner of Lot 4.

"Q. Now, Mr. Congdon, did you, on any occasion about which you are talking, did you have a discussion with

Mr. Todd about right of way for this drainage ditch? A. Yes, indeed.

"Q. Do you remember about when that was? A. That was a relatively short time before the dragline got to the location, and I think it was the latter part of November or the first part of December, 1948.

"Q. What was your conversation with him at that time? A. We went up and looked at the proposed location between him and the Yturrias. Mr. Todd was quite concerned about the drainage inlets, or run-ins, as we sometimes call them. He wanted to know if I would assure him that those would be put in there, and I told him I would. And he wanted to know if we would straddle the line between him and Yturria, and I told him we would. And then he said, 'Alright, if you will do that, and put in the inlets, I'll give you the right of way.'

"Q. What did you say? A. I said alright.

"Q. Well, now, did he say anything at that time about not—about that right of way not being assignable, the District not being permitted to assign it? A. I think not, at that time.

"Q. I mean at any time before the ditch was dug. A. No, I didn't know anything about the non-assignability clause.

"Q. That just came up later? A. That's right.

"Q. Now, what did you do after he made that proposition, and you accepted it? What was the next thing that took place? A. The survey crew was sent out there to survey the line and set stakes for digging the ditch, and as the dragline got to that location, it simply went onto Mr. Todd's land and the Yturria land, onto that strip between them. It was one Saturday about noon that Mr. Todd called up—

"Q. Wait just a moment. Had you —I will ask you whether or not you proceeded to lay the ditch out that way, and so constructed it, in reliance on his proposition? A. That's right.

"Q. Of giving you the right of way on his part of the land, if you would put in drainage inlets? A. That's right."

This evidence must be considered in connection with a part of Congdon's testimony on cross-examination, which is as follows:

"Q. At the time, then, that you and Mr. Todd had this conversation, it was your understanding he would later sign an easement that he and the District would agree on, is that correct? A. That's right.

"Q. And he didn't say at that time that he would give the right of way, except by an easement that would be signed by him later on, is that right? A. He didn't say at that time he would give the right of way * * *?

"The Court: What? A. I'm just trying to get the question in my head, Judge. Would you repeat the question?

"Q. I will ask the reporter to read it to you.

"Mr. Robinson: Will you read it, Mr. Reporter?

"The Reporter: (Reading) 'And he didn't say at that time that he would give the right of way, except by an easement that would be signed by him later on, is that right?'

"A. I think that is correct, yes.

"Q. In other words, he stated he would give a right of way, by delivering an easement which contained certain provisions * * *. A. As I testified before, as I remember the conversation, Mr. Todd said, 'Now I want inlets in here,' and I think he was emphatic that he wanted substantial inlets, that wouldn't wash out. And he wanted the ditch to be half on him and half on Yturria. And I assured him that I would comply with both of those requirements, and he said, 'Alright, I'll give the right of way.' I didn't ask him to sign an easement at that time; we just went on.

"Q. Do I understand you wouldn't accept title until he delivered the ease-

ment? A. I didn't think about that. That is a conclusion of law that I didn't worry about.

"Q. Isn't that your business, to secure these easements as Manager of the District? A. Actually, it was Mr. Haskill's business to get the right of way, under my supervision.

"Q. Do you mean to tell the jury you didn't have authority to make a deal? A. I didn't say that.

"Q. You said it was somebody else's business. A. You asked if it was my business, and I said it was Mr. Haskill's, he was carrying that on.

"Q. Did you rely on Mr. Haskill to make the agreement? A. No, I relied on what Mr. Todd said.

"Q. And at the time he told you this, you say he did discuss certain conditions that he would insist on before he would sign an easement? A. I don't think he said before he would sign an easement; he said if we would install inlets and straddle the line between him and the Yturria, that he would give us the right of way, and to go ahead.

"Q. What day of the week was that when he told you that? A. I couldn't tell you. I don't know.

"Q. And that is the only discussion you had with him between the time you wrote this letter of September 10th, until the excavation began? A. As far as I remember.

"Q. Did the Board request you to submit an executed easement before you began excavation? A. No.

"Q. Was that matter discussed before the Board? A. I don't recall that it was discussed in particular reference to the Todd property. It was discussed generally.

"Q. Mr. Congdon, I believe you stated you had heard that the District had previously had a condemnation suit against Mr. Todd? A. That's right."

The record shows that the excavation actually started on appellee's land in the last days of December 1948, and that prior thereto J. C. Looney, Esq., attorney for appellee, had a conversation with Sawnie B. Smith, Esq., attorney for appellant, the effect of which was to put the attorney upon notice that appellee was contemplating the execution of a written easement and that he wanted three stipulations placed in the easement, one of nonassignability, one a provision for reverter in case of abandonment or nonuse, and another providing for appellant's maintenance of the outlets.

█ It would thus appear, first, that it is very doubtful if appellee ever offered or intended to make a present parol gift of a right-of-way across his land, or even that Congdon, the general manager of appellant, ever so understood, and, second, that if such a parol gift was ever made, appellant had notice, before the excavation had started, that any parol gift had been withdrawn and that appellee intended that a written easement should be agreed upon containing the three provisions above mentioned.

█ Arts. 1288 and 3995, § 4, Vernon's Ann.Civ.Stats., provide in effect that all conveyances of land and interest in land must be in writing, and any parol gift or sale of land is never enforced except to prevent fraud. Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216; Davis v. Douglas, Tex.Com.App., 15 S.W. 2d 232, 233; Wilson v. McLemore, Tex.Civ. App., 242 S.W.2d 791; West Texas Construction Co. v. Adams, Tex.Civ.App., 54 S.W.2d 547; 21 Tex.Jur. 25, 26 and 37.

▪██ One requirement of a valid parol gift of an easement is an intention to make a gift *in praesenti*. This the evidence does not clearly show. Secondly, the donee must make valuable improvements and expend substantial sums of money, with the knowledge and consent of the donor, relying upon the parol gift. The uncontradicted testimony of J. C. Looney, Esq., is that appellant had notice, through its attorney whose duty it was to pass upon easements, that if appellee had ever made a parol gift of the right-of-way for the easement he had revoked such gift and was insisting upon a written easement containing several pro-

visions which were unacceptable to appellant. The money which was spent on the drainage ditch after such notice can not support an estoppel against appellee.

A parol gift must be based, in every instance, upon estoppel. It will not be enforced unless the donee in reliance upon the donor's words moves into possession and erects valuable and permanent improvements. Davis v. Douglas, Tex.Com.App., 15 S.W.2d 232, 233; Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216; Wilson v. McLemore, Tex.Civ.App., 242 S.W.2d 791. Appellant had full notice at the time it began the excavation that appellee would not give the right-of-way to it except upon certain conditions which were not acceptable to appellant.

■ Appellant had the power of eminent domain and appellee did not lose his right to compensation and damages by his failure to protest when he learned that appellant had begun the work of excavating the ditch on his land. 16 Tex.Jur. 952, § 280, where it is said:

"Consent by a land owner to an entry upon his land and the construction of a public work thereon operates as a waiver of any right to recover the land or to enjoin the work. However, the consent to an entry upon the land is not construed as an abandonment of the right to have compensation subsequently adjusted, unless the circumstances are such that this is the only proper inference from the conduct of the plaintiff.

"Again, no estoppel is raised by conduct merely amounting to refraining from taking any action. In the absence of some special statutory provision, the right of action for damages is not waived or lost by the land owner's inaction for any period short of the statutory period of limitation. Thus where an owner had merely consented, for valuable consideration, to an entry upon his land under a parol agreement, it was held that knowledge of the expenditure of moneys by the defendant in constructing a railroad right of way did not estop him from subsequently recovering damages for the land taken and depreciation of the residue of the tract."

See, also, Galveston, H. & S. A. R. Co. v. Pfeuffer & Ireland, 56 Tex. 66; Hamilton County v. Garrett, 62 Tex. 602; San Antonio & A. P. Ry. Co. v. Hunnicut, 18 Tex.Civ.App. 310, 44 S.W. 535.

The conclusions at which we have arrived above render appellant's other points immaterial.

The judgment is affirmed.